United States Court of Appeals,

Fifth Circuit.

Nos. 95-50879, 96-50382.

Daniel JOHNSON, Individually and on Behalf of all Present and Future Inmates of the Texas Department of Criminal Justice---Institutional Division, Plaintiff-Appellee,

v.

Victor RODRIGUEZ, in his Official Capacity as Chairman, Texas Board of Pardons and Paroles, all Present and Future Members of the Texas Board of Pardons and Paroles, in their Official Capacities; Allan B. Polunsky, in his Official Capacity as Chairman, Texas Board of Criminal Justice, and all Present and Future Members of the Texas Board of Criminal Justice in their Official Capacities, Defendants-Appellants.

April 23, 1997.

Appeals from the United States District Court for the Western District of Texas.

Before GARWOOD, DAVIS and STEWART, Circuit Judges.

GARWOOD, Circuit Judge:

In this class action by Texas prisoners, defendants-appellants, the chairmen and members of the Texas Board of Pardons and Paroles and of the Texas Board of Criminal Justice, in their official capacities, appeal the judgment below declaring certain aspects of the Texas parole scheme violative of prisoners' federal constitutional rights of equal protection and access to the courts. Also appealed is the subsequent award of attorneys' fees to plaintiffs' counsel. We reverse the magistrate judge's findings of constitutional violations, vacate the award of attorneys' fees, and remand this case with instructions.

## Facts and Proceedings Below

Daniel Johnson, an inmate of the Texas Department of Criminal

1

Justice—Institutional Division (TDCJ-ID), filed this lawsuit *pro se* and *in forma pauperis* on February 26, 1985. His initial complaint, thrice amended, was dismissed by the district court upon the recommendation of a magistrate judge for failure to state a claim and to exhaust state remedies. This Court reversed and remanded, observing that Johnson's allegations raised "suggestions of invidious, group-based discrimination and infringement of fundamental rights." *Johnson v. Pfeiffer,* 821 F.2d 1120, 1122-1123 (5th Cir.1987) (*Johnson I*). After discussing the shortcomings of his complaint, we ordered that on remand Johnson be allowed an opportunity to amend to clarify the factual and legal basis of his claims. *Id.* at 1123-1124. We expressly reserved opinion as to whether he could even state a claim, much less prove one. *Id.* at 1123.

On remand, the district court appointed counsel to assist Johnson in preparing his Fourth Amended Complaint, which was filed on September 7, 1988. This complaint asserted several purported causes of action under 42 U.S.C. § 1983, alleging, *inter alia,* that the defendants' consideration of "protest letters" and prisoners' "writ-writing" activities in the parole process infringes a panoply of federal constitutional provisions.[1] All parties consented to

---

[1]Johnson's complaint also included claims that a Texas sentencing statute is applied in an *ex post facto* manner, that defendants failed to set a tentative parole month and propose a program of measurable institutional progress for Texas inmates, and that defendants discriminate against non-resident inmates by considering the prior award of furloughs as a factor favoring parole even though non-resident inmates are as a practical matter unable to receive such furloughs. The first two of these claims were dismissed at the summary judgment stage and the furlough claim

final adjudication by a magistrate judge, pursuant to 28 U.S.C. § 636(c).

On February 11, 1992, the magistrate judge, after finding that Johnson adequately represented a class comprised of all present and future inmates of the TDCJ-ID, certified this litigation as a class action limited to prospective relief only. A bench trial was held on June 9-12 and June 23-26, 1992, and July 16, 1992. On November 1, 1995, the magistrate judge issued a memorandum opinion granting Johnson and the prisoner class prospective relief on the protest letter and writ-writing claims. On December 1, 1995, the magistrate judge issued an amended memorandum opinion clarifying aspects of his prior opinion but ordering essentially the same system-wide relief.[2] *Johnson v. Texas Dept. of Criminal Justice,* 910 F.Supp. 1208 (W.D.Tex.1995) (*Johnson II*). On April 30, 1996, the magistrate judge issued another memorandum opinion and order awarding the plaintiffs attorneys' fees in the amount of $959,361.77, expenses and costs in the amount of $35,261.86, and post-judgment interest. Defendants timely appeal judgment on the merits and the award of attorneys' fees.[3]

---

after trial; these dispositions have not been appealed and are now final. The portion of the judgment below finding that the Texas Board of Pardons and Paroles and the Texas Board of Criminal Justice as corporate entities enjoy Eleventh Amendment immunity has not been appealed and is also final.

[2]The magistrate judge agreed to stay aspects of his ordered relief pending appeal. This Court, after hearing oral argument, entered an order staying implementation of the remainder of the ordered relief pending our disposition of the appeal.

[3]The American Civil Liberties Union of Texas, National Rifle Association, Texas Criminal Defense Lawyers Association, Texas

**Discussion**

I. The Texas Parole System---an Overview

The legislative parameters of the Texas parole system are established in large measure by Texas Code of Criminal Procedure article 42.18. Under this statute, the Board of Pardons and Paroles (Board) is the exclusive authority for determining whether qualified prisoners receive parole.[4] Tex.Code Crim. Pro. art. 42.18 §§ 1, 2(1), 8(a) and (g); *Creel v. Keene,* 928 F.2d 707 (5th Cir.1991), *cert. denied,* 501 U.S. 1210, 111 S.Ct. 2809, 115 L.Ed.2d 982 (1991). *See also* Tex. Const. art. IV, § 11. Although the statute does not fetter the Board's discretion to deny parole, it does limit the situations in which parole is authorized to those where the prisoner has secured outside placement and is "able and willing to fulfill the obligations of a law-abiding citizen." Tex.Code Crim. Pro. art. 42.18 § 8(f)(5). Furthermore, a parole panel is empowered to grant parole "only for the best interest of society, not as an award of clemency," and must determine prior to paroling a prisoner that his release "will not increase the likelihood of harm to the public." *Id.* at § 8(f)(5) and (a).

---

Council on Family Violence and Women's Advocacy Project, and a coalition of victims' rights groups have submitted briefs to this court as *amici curiae.*

[4]Under Texas Revised Civil Statutes Annotated article 4413(401) as of January 1, 1990, the powers, duties, obligations, property, and records of the Texas Board of Pardon and Paroles were transferred to the Texas Board of Criminal Justice. *Johnson II,* 910 F.Supp. at 1210 n. 2. As the magistrate judge noted, however, this statute was repealed in 1991 and replaced by Texas Government Code § 491.001, which designates the Board of Pardons and Paroles as a separate entity exercising the powers granted by Code of Criminal Procedure article 42.18. *Id.*

4

The statute also states that the Board "shall develop and implement parole guidelines" based on "the seriousness of the offense and the likelihood of favorable parole outcome." *Id.* at § 8(f)(5). "If a member of the board deviates from the parole guidelines in casting a vote on a parole decision, the member shall produce a brief written statement," to be placed in the prisoner's file, "describing the circumstances regarding the departure from the guidelines." *Id.* The Texas scheme does not, however, require that a parole panel state its reasons for denying parole, nor does it create any constitutionally protected interest in a tentative release date prior to the termination of the sentence imposed. *Gilbertson v. Texas Bd. of Pardons & Paroles,* 993 F.2d 74 (5th Cir.1993).

The Board generally executes its statutory mandate in three-member panels. The particularities of the parole review process are recited in the magistrate judge's opinion:

> "Most inmates are reviewed for parole consideration by a panel of three [members of the Board]. The first panel member often (but not always) interviews the inmate at the institution and writes a summary of the interview for inclusion in the inmate's parole file. The first panel member then "votes the case' by indicating on the docket sheet in the file whether he or she favors release on parole. The second panel member then receives the file and votes the case without an interview. If the first two panel members disagree, the file then goes to the third member for the dispositive vote. If the first two panel members agree, the case does not go to the third member.

> If the panel votes against release on parole the inmate receives a form notice from the Board listing reasons for the unfavorable decision. If the panel votes in favor of release, the inmate is notified of that fact and is told that the decision is tentative and may be rescinded, depending upon the Board's further investigation. The inmate receives a notice known as an "F.I.' (further investigation).

5

At a point in time roughly contemporaneous with the panel's consideration of an inmate's case, the Board sends out notification to the persons entitled to receive notice under the statute." *Johnson II,* 910 F.Supp. at 1216.

Texas Code of Criminal Procedure article 42.18 § 8(f)(2) mandates that the parole division of the TDCJ-ID notify the victim, his or her legal guardian, or a close relative (if the victim is deceased) when the prisoner incarcerated for the victimizing offense is being considered for parole. This provision specifically allows the person notified to submit to the panel a written statement. In addition, the person notified is entitled to appear before the panel, either in person or through a representative, and voice his or her views about the offense, the prisoner, and the crime's effect on the victim.[5] Subsection 8(f)(2) also declares, however, that "[t]his subsection may not be construed to limit the number of persons who may provide written statements *for or against* the release of the prisoner on parole." Finally, subsection 8(f)(2) requires that in making individual parole determinations a parole panel "consider" the "victim impact statement," a document which is developed during the prisoner's prosecution and details the effects of the crime on the victim. *See* Tex.Code Crim. Proc. art. 56.03.

Generally, the parole panel's review is guided in large part by the contents of the prisoner's parole file. Subsection 8(e) of

---

[5]The magistrate judge noted the tension between the requirement for an oral statement before the panel and the typical panel's practice of reviewing the prisoner's file and individual member voting at separate junctures rather than at a single panel sitting.

article 42.18 directs that the prisoner's parole file include the "victim impact statement" and "*any* written comments or information provided by local trial officials or victims of the offense." Thus, relevant correspondence, pro or con, from any and all interested parties *may* be received and considered by a parole panel; correspondence from "local trial officials" and "victims" *must* be included in the prisoner's parole file, while the "victim impact statement" *must* be considered in making the ultimate parole determination. Regardless of what circumstances must be *considered* in a parole hearing, the ultimate *result* (parole or denial) is a matter left completely to the parole panel's discretion.

Subsection 8(e) also provides that the parole file contain "all pertinent information relating to the prisoner, including but not limited to," a sentencing report, the circumstances of the prisoner's offense, records of the prisoner's prior social and criminal history, physical and mental health records, and reports reflecting the prisoner's conduct, employment, and attitude while incarcerated. The statutory language makes it clear that this listing is not exhaustive, *i.e.,* information other than that mandated by subsection 8(e) may appear in a prisoner's parole file.[6] Finally, under subsection 18(a) of article 42.18 the contents of the prisoner's parole file are confidential and

_____

[6]Testimony adduced below indicates that the parole files of some prisoners contain indications of prior litigation activity undertaken by that prisoner. Our review of the record indicates that such references are on the whole fairly generalized, *e.g.,* typifying a prisoner as "litigious" or noting that the prisoner spends time in the law library or is receiving paralegal instruction.

7

privileged and therefore generally inaccessible to the prisoner.[7]

II. Protest Letters

**A. The Issue**

Johnson[8] challenges the statutory requirement and perceived Board custom of accepting and considering "protest letters" in the parole process. Johnson claims that these letters, which include statements from victims, prosecutors, law enforcement personnel and the general public opposing the prisoner's parole, often contain inaccurate information about the prisoner's background or the circumstances of his or her offense. Furthermore, much of the information submitted in these letters bears no relationship to the "two statutory factors," *i.e.,* the likelihood of harm to the public and the likelihood of a favorable parole outcome, which the Board is purportedly required to consider in making parole

---

[7]For purposes of this litigation, limited discovery of parole file materials, typically limited to *in camera* review of those materials by the magistrate judge, was allowed. A number of those files, including that of Johnson, are part of the record we review.

[8]The magistrate judge below largely failed to distinguish between Johnson's claims in his individual capacity and those brought on behalf of the prisoner class of which he is a member. The course of our disposition on appeal does not require us to distinguish the two, and subsequent references in this opinion to "Johnson" may include both his personal claims and those brought as class representative. In the ordinary case, however, personal claims of a class representative, insofar as they parallel class claims, should be resolved first because as a general rule class injuries attributable to members of a class but not sustained by a named class representative cannot be remedied in the class action lawsuit. *Lewis v. Casey,* --- U.S. ----, ----, 116 S.Ct. 2174, 2183, 135 L.Ed.2d 606 (1996). *See, however, County of Riverside v. McLaughlin,* 500 U.S. 44, 50-52, 111 S.Ct. 1661, 1667, 114 L.Ed.2d 49 (1991) (noting exception to this rule when representative's injury is mooted or otherwise nonjusticiable and the nature of the injury is inherently transitory).

determinations. Johnson submits that the resultant system is arbitrary and capricious and treats prisoners who are the target of protest letters differently from prisoners who do not receive protest letters.

**B. The Magistrate Judge's Ruling**

The magistrate judge found, after reviewing testimony from both prisoners and Board members, that "inmates who receive protest letters of any kind are treated differently from inmates who do not." *Johnson II,* 910 F.Supp. at 1218. He continued by noting that the Board has no promulgated rule or articulated policy regarding the verification or consideration or effect of protest letters. *Id.* at 1218-1219. The magistrate judge further found that these letters, in some instances spawned by vindictiveness or political pressure, often contain inaccurate statements of fact or discuss unadjudicated offenses. *Id.* at 1219-1220.

The magistrate judge began his legal analysis by correctly noting that Texas law does not create a liberty interest in parole and accordingly Johnson could not state a claim for a Due Process violation based upon the Board's procedures. *Allison v. Kyle,* 66 F.3d 71 (5th Cir.1995); *Orellana v. Kyle,* 65 F.3d 29 (5th Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 736, 133 L.Ed.2d 686 (1996); *Gilbertson; Creel; Williams v. Briscoe,* 641 F.2d 274 (5th Cir.), *cert. denied,* 454 U.S. 854, 102 S.Ct. 299, 70 L.Ed.2d 147 (1981). The magistrate judge did, however, accept Johnson's argument that prisoners who receive protest letters constitute a governmental classification for Equal Protection purposes. *Johnson*

*II,* 910 F.Supp. at 1221. After conducting an extensive analysis of the legislative scheme set out by Texas Code of Criminal article 42.18, the magistrate judge observed that "almost all of the letters introduced into evidence have little or nothing to do with the two statutory factors that the Board is to consider when making parole decisions."[9] *Id.* at 1227. The magistrate judge then reached the following, sweeping conclusion:

> "The Court hereby determines that the statutory scheme under which the Board can accept statements, whether written or oral, and then prevent knowledge of said statements' existence and prohibit disclosure of their contents and of the writer's or speaker's identity, violates the equal protection rights of inmates because the Board, as a rule, denies parole to inmates who have received protest statements. The Board's sole function is to determine whether an inmate should be released on parole; its function is not to effectively re-try the case by accepting "testimony' which was inadmissible at trial on evidentiary grounds (or would have been inadmissible had introduction been attempted) or was excluded as part of trial strategy, or by entering findings which the actual jury did

---

[9]Although not necessary to our resolution of this case, we observe that the magistrate judge's conclusion that these "statutory factors" must be considered in each instance by individual parole panels is unsupported by the plain language of the statute. Although these factors are to be the basis under subsection 8(f)(5) of the "parole guidelines" which the Board is directed to "develop and implement," nothing in the statute suggests that a direct consideration of these factors is mandated in individual parole evaluations. Such a reading inflates the significance of these two factors to the detriment not only of the parole guidelines themselves but also of the other legislative limitations upon the Board's discretion, noted in our discussion in Subpart I, *supra,* and runs counter to this Circuit's repeated holdings that the Texas parole scheme does not create a legitimate expectation of release or concomitant protected liberty interest. *Compare Dace v. Mickelson,* 816 F.2d 1277 (8th Cir.1987) (*en banc* ) (discussing when state law requiring release upon finding of particular facts may create a cognizable liberty interest). We emphasize that this point is noted for elucidatory purposes only: in the absence of a cognizable constitutional violation, the situation herein presented, the interpretation and implementation of the Texas parole statute is a matter for the appropriate state agencies and not this Court.

10

not find at the inmate's trial. Evidentiary determinations are to be made in the trial court. The Board is not to consider unadjudicated offenses or offenses extraneous to the conviction for which the inmate is currently incarcerated. The Board must be bound by the conviction which the inmate received and must apply the statutory requirements regarding the time to be served on parole for that conviction, without adding ad hoc information which results in additional time being served." *Id.* at 1228-1229 (*footnote omitted* ).

The magistrate judge ordered that the Board adopt a rule providing that both written and oral protest statements "shall not be accepted or considered" by parole panels "for any purpose when making parole decisions" and "shall not be placed in the inmate's file." *Id.* at 1229.

## C. Analysis

"The Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must co-exist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans,* --- U.S. ----, ----, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996) (citations omitted). Thus, "a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect." *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). Rather, as long as they do not burden a fundamental right or target a suspect class, "state agencies may pursue legitimate purposes by any means having a conceivable rational relationship to those purposes." *Stern v. Tarrant County Hosp. Dist.,* 778 F.2d 1052, 1054 (5th Cir.1985) (*en banc* ), *cert. denied,* 476 U.S. 1108, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986).

11

Even the deferential "rational basis" scrutiny which is applied to ordinary governmental classifications is not appropriate, however, when the challenged law does not create any classifications at all. As we have previously stated, "if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action----even if irrational----does not deny them equal protection of the laws." *Brennan v. Stewart,* 834 F.2d 1248, 1257 (5th Cir.1988) (citation omitted). Thus, when we are confronted with a state action which does not so classify or distinguish, we need not consider whether there is a "rational basis" for that action because such state actions are not subject to Equal Protection scrutiny. *Vera v. Tue,* 73 F.3d 604, 609-610 (5th Cir.1996), *citing Brennan,* 834 F.2d at 1257.

State actors may create classifications facially, when such categorization appears in the language of legislation or regulation, *see, e.g., McGinnis v. Royster,* 410 U.S. 263, 270, 93 S.Ct. 1055, 1059, 35 L.Ed.2d 282 (1973) ("[t]he determination of an optimal time for parole eligibility elicited multiple legislative classifications and groupings"), or *de facto,* through the enforcement of a facially neutral law in a manner so as to disparately impact a discernible group. The Supreme Court has instructed us time and again, however, that disparate impact alone cannot suffice to state an Equal Protection violation; otherwise, *any* law could be challenged on Equal Protection grounds by whomever it has negatively impacted. *See Washington v. Davis,* 426 U.S. 229,

12

246-250, 96 S.Ct. 2040, 2051-2052, 48 L.Ed.2d 597 (1976). Thus, a party who wishes to make out an Equal Protection claim must prove "the existence of purposeful discrimination" motivating the state action which caused the complained-of injury. *McCleskey v. Kemp,* 481 U.S. 279, 292-293, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987) (citation omitted); *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264-266, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Davis*, 426 U.S. at 238-240, 96 S.Ct. at 2047. "Discriminatory purpose in an equal protection context implies that the decisionmaker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group." *Woods v. Edwards,* 51 F.3d 577, 580 (5th Cir.1995), *quoting United States v. Galloway,* 951 F.2d 64, 65 (5th Cir.1992).

The existence of a discoverable group or classification antedating the challenged state action is a *sine qua non* for proving purposeful discrimination; it cannot tenably be maintained that the state selected a particular course of action to harm an "identifiable group" when that body did not exist until *after* the state acted. In this case, there is no basis for discerning any such pre-existing "identifiable group." The magistrate judge found that a class composed of those prisoners who received protest letters was denied equal treatment by the Texas statutes authorizing the receipt, use, and confidentiality of protest letters. The challenged laws, however, do not discriminate among prisoners; they apply to *all* prisoners *equally* and impact the

13

prison population in a manner which the magistrate judge himself correctly described as "unpredictable." *Johnson II,* 910 F.Supp. at 1226-1227 ("[o]bviously, an inmate's potential for receiving protest letters is unpredictable"). Such a finding of "unpredictability" negates any argument that the Texas Legislature or the Board intended that the use of protest letters evidenced by this record detrimentally impact any particular identifiable segment of the prison population.[10] Because Johnson has failed to demonstrate that the State's action targeted a discernible sub-class among the general prison population, the magistrate judge's ruling must be reversed.

Moreover, the magistrate judge, incorrectly perceiving an Equal Protection *question* before him, also failed to properly consider Texas' justification for the protest letter scheme before finding an Equal Protection *violation.* *See Bowen v. Owens,* 476 U.S. 340, 106 S.Ct. 1881, 90 L.Ed.2d 316 (1986). Under the rational basis scrutiny which the magistrate judge should have undertaken if, as he incorrectly assumed, the protest letter issue was properly resolvable under an Equal Protection analysis, it was merely necessary to determine whether "the classification at issue

---

[10]Nor do we find prisoners *qua* prisoners to be such a classification insofar as the parole statute is concerned. While it is evident that prisoners are a "class" within the context of the general population, *see Hilliard v. Ferguson,* 30 F.3d 649 (5th Cir.1994), there is a marked difference when the parole context is examined. Unlike laws which regulate a specific sub-group in the larger society, the relevant "general population" for parole laws *is* the prison population; unlike laws that tax, regulate, subsidize, or circumscribe, parole release provisions can never impact the ordinary citizen who has not been convicted and incarcerated.

bears some fair relationship to a legitimate public purpose."[11]

*Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). The magistrate judge's opinion, however, dwells upon the nature of the "evidence" which the Board considers, the inability of prisoners to examine and rebut such evidence, and the possibility that false information will enter the prisoner's parole file by way of a protest letter.[12] In so doing, the magistrate

[11]The provisions of the parole statute entitling victims or their close family members to notification and an opportunity to respond are part and parcel of Texas' proclaimed public policy of furthering the rights of victims, a legitimate and rational state purpose. *See* Texas Constitution, Article 1, § 30. Affording such persons protection against reprisal by maintaining the confidentiality of their protests is similarly rational. Nor is it irrational for the state to avoid the expense and inconvenience of formal, adversarial type parole hearings.

[12]The magistrate judge cited *Sandin v. Conner,* --- U.S. ----, ----, 115 S.Ct. 2293, 2302, 132 L.Ed.2d 418 (1995), for the proposition that the Board could not use written or oral statements in parole determinations unless the prisoner had the chance to review the statements and, if appropriate, rebut them. *Johnson II,* 910 F.Supp. at 1228. First, this holding of the magistrate judge, essentially a type of procedural Due Process hearing requirement, is contrary to settled precedent. *See, e.g., Jago v. Van* Curen, 454 U.S. 14, 21-22, 102 S.Ct. 31, 36, 70 L.Ed.2d 13 (1981); *Jackson v. Reese,* 608 F.2d 159, 160 (5th Cir.1979). Second, *Sandin*'s passing reference to the procedures which Hawaii affords to its state prisoners in the parole process was merely ancillary to a determination that Hawaiian prisoners had no right to procedural Due Process in the there-challenged prison disciplinary hearing, which was the only issue before the Court. *Sandin* expressed no view as to whether any character of process was constitutionally required for Hawaii parole decisions. For these reasons, as well as those reflected in our discussion of the reach of the Due Process Clause in the parole context, *infra,* the magistrate judge's statement of the law was incorrect.

The magistrate judge also found, relying upon *Cook v. Tex. Dep't of Criminal Justice Planning Dep't,* 37 F.3d 166, 168-169 (5th Cir.1994), that the Board could not consider unadjudicated offenses in parole hearings. *Johnson II,* 910 F.Supp. at 1229 n. 73. *Cook,* however, dealt with the particular circumstance of prior convictions which this Court

15

judge conflated what should have been two distinct inquiries: 1) is the application of the laws discriminatory, a matter for the Equal Protection Clause, and 2) does the application of the laws produce a result which is unreliable, a concern which speaks to procedural Due Process.

The protections of the Due Process Clause are only invoked when State procedures which may produce erroneous or unreliable results imperil a protected liberty or property interest. *See Olim v. Wakinekona,* 461 U.S. 238, 250-251, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983); *Jago,* 454 U.S. at 16-18, 102 S.Ct. at 34; *Meachum v. Fano,* 427 U.S. 215, 223-225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976); *Jay v. Boyd,* 351 U.S. 345, 352-361, 76 S.Ct. 919, 924-928, 100 L.Ed. 1242 (1956). It is therefore axiomatic that because Texas prisoners have no protected liberty interest in parole they cannot mount a challenge against any state parole review procedure on procedural (or substantive) Due Process grounds. *Allison; Orellana; Gilbertson; Creel. Accord, Hill v. Jackson,* 64 F.3d 163 (4th Cir.1995); *O'Kelley v. Snow,* 53 F.3d 319

----

had previously set aside on the basis of federal constitutional violations, and stands only for the unremarkable rule that when a conviction has been thus judicially nullified a prisoner may obtain an order enjoining use of the voided conviction in a parole hearing, and might even be seen essentially as a federal court enforcing its own prior order. *See Bloodgood v. Garraghty,* 783 F.2d 470 (4th Cir.1986) (holding parole board has no duty to examine validity of prisoner's convictions); *United States v. Francischine,* 512 F.2d 827, 828 (5th Cir.) (same), *cert. denied,* 423 U.S. 931, 96 S.Ct. 284, 46 L.Ed.2d 261 (1975). In the absence of such a circumstance, there is nothing delimiting the Board's consideration of prior offenses, adjudicated or unadjudicated.

(11th Cir.1995); *McCall v. Delo,* 41 F.3d 1219 (8th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 2623, 132 L.Ed.2d 865 (1995); *Malek v. Haun,* 26 F.3d 1013 (10th Cir.1994); *Phillips v. Brennan,* 969 F.2d 384 (7th Cir.1992), *cert. denied,* 506 U.S. 1057, 113 S.Ct. 990, 122 L.Ed.2d 142 (1993); *Brandon v. D.C. Board of Parole,* 823 F.2d 644 (D.C.Cir.1987); *White v. Hyman,* 647 A.2d 1175 (D.C.C.A.1994); *State ex rel. Hattie v. Goldhardt,* 69 Ohio St.3d 123, 630 N.E.2d 696 (1994). Were we to allow Johnson's Equal Protection challenge in the absence of any showing of *de jure* or *de facto* governmental classification, we would be in effect endorsing, under the aegis of "Equal Protection," the general federal constitutional right to be free from arbitrary and capricious state action which our procedural Due Process precedents eschew. *Irving v. Thigpen,* 732 F.2d 1215, 1218 (5th Cir.1984) (where Mississippi parole law does not create a protected liberty interest, a prisoner "cannot maintain a section 1983 action or a *habeas* petition on the grounds that the parole board deprived him of procedural due process") (citations omitted). Johnson's allegations that the Board considers unreliable or even false information in making parole determinations, without more, simply do not assert a federal constitutional violation.[13] *Compare Dock,* 729 F.2d at 1290 ("there

---

[13]The underlying dispute on this issue is whether (and if so, to what extent) a prisoner enjoys a federal right to have accurate information in his or her parole file. *Compare Townsend v. Burke,* 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948) (Due Process violation for district court to sentence defendant based on misinformation). We recognize that the jurisprudence in some of the other circuits is somewhat inconsistent in this area. *See, e.g., Perveler v. Estelle,* 974 F.2d 1132 (9th Cir.1991) (reviewing *habeas* petitions disputing state parole results under the same

17

administrative standard as findings of the United States Parole Commission). Johnson relies in large measure upon *Monroe v. Thigpen,* 932 F.2d 1437 (11th Cir.1991), in which the court found that a state parole board's admitted use of false information was arbitrary and capricious and constituted a violation of Due Process. Subsequent Eleventh Circuit precedent, while not expressly overruling *Monroe,* has noted that no Due Process rights exist for parole procedures where there is no legitimate expectation of parole. *See O'Kelley,* 53 F.3d at 321-322. Furthermore, *Monroe* itself limits the "right" which it uncovered to situations where the state admits the use of false information; a prisoner's allegations that false information was used to deny him parole is insufficient, in the absence of such an admission, to state a claim under section 1983. *Monroe,* 932 F.2d at 1442. *See James v. Robinson,* 863 F.Supp. 275 (E.D.Va.1994), *aff'd,* 45 F.3d 426 (4th Cir.1994).

Additionally, although not relied upon by Johnson, the Fourth Circuit in *Paine v. Baker,* 595 F.2d 197 (4th Cir.), *cert. denied,* 444 U.S. 925, 100 S.Ct. 263, 62 L.Ed.2d 181 (1979), developed a tripartite test to determine when "false information" should be expunged from prison records. *Monroe* discussed *Paine* in passing and concluded that language in *Paine* indicating a "due process right to be fairly considered for parole" had been invalidated by the Supreme Court's subsequent decision in *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). *Monroe,* 932 F.2d at 1440-1441 n. 8. In addition, although *Paine* has not been expressly overruled, subsequent Fourth Circuit cases reflecting this Circuit's view certainly undercut any contention that the *Paine* analysis is still viable in the circuit which initially formulated it. *See, e.g., Hill,* 64 F.3d at 170-171. Those courts that continue to give lip service to *Paine* have practically emasculated it by reading its third requirement, that the information be relied upon to a constitutionally significant degree, in tandem with subsequent jurisprudence recognizing that there is no procedural Due Process protection for procedures which are unrelated to a protected liberty interest. *See Pruett v. Levi,* 622 F.2d 256 (6th Cir.1980); *James; McCrery v. Mark,* 823 F.Supp. 288 (E.D.Penn.1993); *Goldhardt.* Contrast *Lowrance v. Coughlin,* 862 F.Supp. 1090, 1099 (S.D.N.Y.1994) (stating that the Southern District of New York has recognized a constitutional right to accurate information in a parole file).

It is our view that the procedural Due Process protections created in *Monroe* and *Paine* are in essence inconsistent with subsequent precedent in their respective circuits and that both cases have thus been effectively

18

simply is no constitutional guarantee that all executive decisionmaking must comply with standards that assure error-free determinations") (*citations omitted* ). Rather, such concerns are matters for the responsible state agencies and it is to those bodies that grievances concerning parole procedures should be addressed. *Brandon,* 823 F.2d at 649.

"A violation of the equal protection clause occurs only when, *inter alia,* the governmental action in question classifies between two or more relevant persons or groups." *Vera,* 73 F.3d at 609-610. Johnson has failed to demonstrate this necessary predicate to his claim.[14] We therefore reverse the magistrate judge's contrary

overruled. Whatever the viability of these anomalous cases today, our precedent is definite and precise on this point: in the absence of a cognizable liberty interest, a state prisoner cannot challenge parole procedures under the Due Process Clause.

[14]This holding is not a departure from our prior view in *Johnson I,* 821 F.2d at 1122-1123. There we found only that Johnson *perhaps* could state a cause of action because his allegations concerned protest letters being used as a pretext for discriminatory treatment of the sub-class of writ writers among the prison population. *See id.* at 1122 (characterizing Johnson's claims respecting "use of protest letters in parole determinations" as arguably including assertions "that *writ writers* are ... denied equal protection in this manner" and "that use of such letters infringes on writ writers' freedom of speech"; emphasis added). Indeed, this Court expressly disfavored the result obtained below:

"In an effort to support the district court's judgment regarding the Parole Board's "discretionary' use of protest letters on grounds not stated by that court, the defendants suggest that Johnson has failed to allege sufficient facts to state a claim. Noting that the fourteenth amendment guarantees "equal laws, not equal results,' they argue that a rule permitting such discretion, if applied evenly, presents no constitutional problem. We agree, but note that Johnson's allegations do raise suggestions of invidious, group-based discrimination and infringement of fundamental rights."

ruling and order that on remand the protest letters claim be dismissed with prejudice.

III. Writ-Writing

## A. The Issue

Johnson is a "writ writer," which is generally understood to mean a prisoner who files lawsuits, and/or assists other prisoners in the preparation or prosecution of lawsuits, usually against prison (or sometimes jail) authorities and including conditions of confinement and habeas cases and suits against law enforcement and court personnel.  Johnson claims that many parole files contain some record of or reference to a prisoner's litigation activities, and that this information is considered by parole panels.  Johnson contends that this information is viewed negatively by the Board and that many prisoners are denied parole at least in part due to their litigiousness.  Johnson contends that the Board is in fact retaliating against him and the other prisoners who avail themselves of their constitutional right of access to the courts. Furthermore, insofar as this practice discriminates against "writ

---

*Id.* at 1122-23 (footnote omitted).

Moreover, we expressly reserved judgment, stating:  "We intimate, of course, no opinion concerning the possibility of his *stating a claim* for which relief might be granted, *or,* if he does, the merits of that claim." *Id.* at 1123. (Emphasis added).

Because the *Johnson I* court's remand depended upon assumptions concerning the identity of the group being discriminated against which are inapposite to the findings below, and because *Johnson I* in any event expressly reserved judgment as to whether a claim could even be stated, that opinion is not inconsistent with our holdings today.

writers" in the general prison population, he contends that it constitutes a violation of the Equal Protection Clause.

## B. The Magistrate Judge's Ruling

Reviewing the evidence, the magistrate judge found that writ writing activities were often discussed in parole interviews and that documentation of these activities often appeared in parole files. *Johnson II,* 910 F.Supp. at 1214. The magistrate judge also found that prisoners were entitled to assist other prisoners in preparing writs and other legal documents. *Id.* at 1213. After noting that "historically there has been a bias against inmates considered to be writ writers" by the TDCJ-ID, the magistrate judge concluded that this bias "restricts, at least as a practical matter, an inmate's access to the courts." *Johnson II,* 910 F.Supp. at 1212. He likewise opined that "*[a]ny distinction made between inmates who seek access to the courts and those who do not violates the equal protection clause.*" *Id.* at 1213 (emphasis added). Later in his opinion the magistrate judge clarified his findings of injury, stating that "this perception of retaliation has chilled, at least to some extent, inmates' exercise of their constitutionally protected right of access to the courts." *Id.* at 1215 (footnote omitted).

The magistrate judge ordered the Board to adopt by rule a policy "that prohibits consideration of inmates' exercise of the constitutionally protected right of access to the courts" and "shall specify that such activity is wholly irrelevant to the parole decision making process." *Johnson II,* 910 F.Supp. at 1215.

21

He further required that this rule "shall establish specific, enforceable sanctions for all violations" thereof. *Id.* In addition, the order required that "[a]ll existing [inmate] files be reviewed for and purged of *any and all documentation related to an inmates' litigation activity* as the specific inmate becomes eligible for [parole] review. Only upon written request of an inmate shall *any litigation material or information* be included or retained in his or her parole file." *Id.*(emphasis added).

## C. Analysis

### 1. The Retaliation Theory

The elements of a claim under a retaliation theory are the plaintiff's invocation of "a specific constitutional right," the defendant's intent to retaliate against the plaintiff for his or her exercise of that right, a retaliatory adverse act, and causation, *i.e.,* "but for the retaliatory motive the complained of incident ... would not have occurred." *Woods v. Smith,* 60 F.3d 1161, 1166 (5th Cir.1995) (*citations omitted* ), *cert. denied,* --- U.S. ----, 116 S.Ct. 800, 133 L.Ed.2d 747 (1996). In this case, Johnson must prove that he and other prisoners engaged in constitutionally protected litigation activity, were denied parole, and that such action was taken "in an effort to chill [prisoners'] access to the courts or to punish them for having brought suit." *Enplanar, Inc. v. Marsh,* 11 F.3d 1284, 1296 (5th Cir.), *cert. denied,* 513 U.S. 926, 115 S.Ct. 312, 130 L.Ed.2d 275 (1994). *See also Serio v. Members of La. State Bd. of Pardons,* 821 F.2d 1112, 1114 (5th Cir.1987). The relevant showing in such cases must be

22

more than the prisoner's "personal belief that he is the victim of retaliation." *Edwards,* 51 F.3d at 580.

It has long been recognized that prisoners generally enjoy a constitutional right of access to the courts. *See Johnson v. Avery,* 393 U.S. 483, 483-485, 89 S.Ct. 747, 748, 21 L.Ed.2d 718 (1969); *Ex parte Hull,* 312 U.S. 546, 547-549, 61 S.Ct. 640, 641, 85 L.Ed. 1034 (1941). This right of access for prisoners is not unlimited, however; rather, it encompasses only "a reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement." *Lewis v. Casey,* --- U.S. ----, ----, 116 S.Ct. 2174, 2182, 135 L.Ed.2d 606 (1996). Furthermore, we held in *Tighe v. Wall,* 100 F.3d 41, 43 (5th Cir.1996), that "[p]risoners have no right to a particular prisoner's help in legal matters as long as the putative recipient's constitutional right of access to the courts is not infringed." The relevant constitutional protection in this instance accrues to the benefit of the prisoner in whose name the lawsuit is filed, not those who assist in the preparation of that lawsuit.[15] *See Lewis,* --- U.S. at ----, 116 S.Ct. at 2184 ("the

---

[15]The magistrate judge relied upon the Supreme Court's pronouncements in *Johnson*, 393 U.S. at 483-489, 89 S.Ct. at 748-750, and *Wolff v. McDonnell,* 418 U.S. 539, 578-580, 94 S.Ct. 2963, 2986, 41 L.Ed.2d 935 (1974), in concluding that the state could not retaliate against prisoners who assist other prisoners in preparing lawsuits. As the Supreme Court's decision in *Lewis* and our *Tighe* opinion make clear, however, while the assistance of other prisoners may be one way in which a particular prisoner's right of constitutional access to the courts is vindicated, such is not in and of itself a constitutional right. If State regulation or proscription of "writ writing" endangers a prisoner's ability to file lawsuits protected under *Lewis,* then it is that particular prisoner's constitutional rights which have been violated. While

23

Constitution does not require that prisoners ... be able to conduct generalized research, but only that they be able to present their grievances to the courts").  Thus, neither any frivolous filings nor secondary litigation activity, *i.e.,* legal research and writing that does not involve preparation of lawsuits challenging a writ writer's own conviction(s) or the conditions of his or her confinement, may comprise the basis of a retaliation claim. Conversely, a parole panel's consideration of such unprotected activity in denying a prisoner parole does not infringe that prisoner's constitutional right of access to the courts.  *Id.* at -- --, 116 S.Ct. at 2182 ("[i]mpairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration"). The magistrate judge did not have the benefit of either *Lewis* or *Tighe,* and, of course, is not to be faulted for failing to address them.

In concluding that the prisoners' constitutional right of access to the courts had been violated, the magistrate judge plainly considered, and proceeded throughout on the assumption, that *any and all* prisoner writ writing or litigation activity was constitutionally protected.  At no point did he ever distinguish

---

jailhouse lawyers may (or may not) present an inexpensive and relatively burdenless means of respecting other prisoners' rights of access to the courts, the particular means by which Texas prisoners' constitutional rights are to be vindicated is left as a primary matter to the proper Texas authorities, and federal courts should not intrude until "some inmate [can] demonstrate that a nonfrivolous legal claim ha[s] been frustrated or ... impeded." *Lewis,* --- U.S. at ----, 116 S.Ct. at 2181.

24

between frivolous filings and secondary litigation activity on the one hand and protected filings of at least arguable merit on the other.[16]  Almost all of the prisoners who testified alluded to participation in numerous lawsuits.[17]  In the absence of detailed

[16]We note that, with the exception of pauper petitions under 28 U.S.C. § 1915(d) and the imposition of certain sanctions, express findings of frivolity are typically not required before a case is summarily dismissed.  Moreover, a lawsuit which does not appear frivolous on the face of the pleadings may turn out to be (and have been) so when the pleadings are pierced at a preliminary hearing, discovery, summary judgment, or trial.  Because it is the prisoner who bears the burden of proving a constitutional violation it is the prisoner who must demonstrate the protected character, including non-frivolity, of prior lawsuits in which he was involved.

[17]Although there is record evidence concerning the persistent litigiousness of the named class representative, Daniel Johnson, there is no evidence of record concerning the scope or results of his litigation activities.  *See, however, Johnson v. Kegans,* 870 F.2d 992 (5th Cir.1989) (section 1983 action filed by Johnson dismissed as frivolous);  *Holmes v. Hardy,* 852 F.2d 151 (5th Cir.1988) (section 1983 action brought by Johnson and other prisoners dismissed as frivolous);  *Whittington v. Lynaugh,* 842 F.2d 818 (5th Cir.1988) (section 1983 action brought by Johnson and another prisoner dismissed as frivolous with sanctions);  *Johnson v. Onion,* 761 F.2d 224 (5th Cir.1985) (section 1983 action filed by Johnson dismissed due to failure to present a case or controversy).  Among the other prisoners who testified, Terrence Spellmon stated that he has filed fifteen lawsuits since being incarcerated.  Mark Fields testified that he has filed "about 200" lawsuits, only six to eight of those being suits in which he is the named plaintiff.  Robert Delgado testified that he has filed "about twelve lawsuits" since being incarcerated.  Thomas Baranowski, although he did not give a total number of prior lawsuits filed, alluded to at least four separate lawsuits he has filed in his own behalf.  George Hall testified that he had filed "quite a few [lawsuits] against Hutchinson County."  Kenneth Thompson, Jr., testified that he has filed a "considerable amount of litigation" against Texas prison officials on his own and other prisoners' behalf.  There is no finding or evidence indicating even approximately what portion of prisoner writ writing is constitutionally protected under the standards of *Lewis* and *Tighe.*

From our appellate review over the years of very large numbers of Texas prisoner suits, we know that a great many—perhaps the overwhelming majority or even almost all—of

25

information regarding the named parties, subject matter, arguable merit, and disposition of those lawsuits, however, there is no way to determine the extent to which the prisoners' constitutional rights of access to the courts, as defined by *Lewis* and *Tighe,* are implicated. Furthermore, when a prisoner's litigation history includes both protected and unprotected activity, if a parole panel's adverse action is attributable to unprotected activity and would have occurred on that basis regardless of the exercise of protected rights, the claim fails on the element of causation, *i.e.,* the requirement that "but for" the state's motive to retaliate against the prisoner for the exercise of his constitutional rights parole would not have been denied.[18] *See Enplanar, Inc.,* 11 F.3d at 1297.

While the magistrate judge's use of an improper and overly inclusive legal standard (viewing any and all writ writing as constitutionally protected) alone requires reversal, we also note other inadequacies in the findings on which the judgment below depends. Because this is an official capacity lawsuit, it is a condition precedent to liability under section 1983 that the challenged conduct of the individual Board members be tied to an official Board custom or policy, formal or informal. *Kentucky v.*

---

them have been without arguable merit.

[18]When a substantial amount of a writ writer's time is devoted to litigation-related activity which is unprotected, generalized references in the parole file or during parole interviews to "litigiousness" will usually be insufficient to prove that the state has retaliated against the prisoner for his or her exercise of a constitutional right.

26

*Graham,* 473 U.S. 159, 165-167, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Polk County v. Dodson,* 454 U.S. 312, 325-327, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981). While the magistrate judge did observe that "writ writing activities are frequently discussed in parole interviews and that documentation of such activities frequently appears in inmates' parole files," *Johnson II,* 910 F.Supp. at 1214, he made no finding that these actions were sufficiently widespread and approved to represent the implementation of an official formal or informal custom or policy of the Board. *See Ruiz v. Estelle,* 679 F.2d 1115, 1154 (5th Cir.1982) (*citation omitted* ) ("systemwide injunctive relief may not be predicated on individual misconduct that "is not part of a pattern of persistent and deliberate official policy' "), *opinion amended in part and vacated in part,* 688 F.2d 266 (5th Cir.1982), *cert. denied* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). In the absence of this threshold finding, the imposition of liability, under either a retaliation or an equal protection theory, was premature.

Furthermore, while we do not directly address the sufficiency of the evidence to support the magistrate judge's finding that there has historically been a bias against writ writers by employees of the Texas *prison* system, we nonetheless express concern over the magistrate judge's reliance, both expressly and through apparent reliance on witness testimony, upon findings associated with the hallmark Texas prison litigation case of *Ruiz v. Estelle,* 503 F.Supp. 1265 (S.D.Tex.1980), *aff'd in part, rev'd*

*in part,* 679 F.2d 1115 (5th Cir.1982), *opinion amended in part and vacated in part,* 688 F.2d 266 (5th Cir.1982), *cert. denied* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). *Johnson II,* 910 F.Supp. at 1212 n. 12. The findings involved in that case were made more than a decade and a half ago and involved the day-to-day administration of penal institutions run by the predecessor of the TDCJ-ID, *not the parole system which is the object of this litigation.* Findings that in the past (or present), employees of other state departments or agencies have exhibited a bias against writ writers do not support a conclusion that the defendants in this case, members of the Board, have acted and continue to act with retaliatory animus in denying prisoners parole. The findings of the *Ruiz* court are generally inapposite and of only the most marginal relevance to the current litigation.

In addition, we hold that the magistrate judge's findings of causation are inadequate because the mere *consideration* of litigation activities, even if such activities are protected under *Lewis* and *Tighe,* does not in and of itself make out Johnson's retaliation claim. *Johnson II,* 910 F.Supp. at 1215-1216 n. 17. There must be a finding, adequately supported by the evidence, that pursuant to an established policy or custom (formal or informal), the Board retaliated against writ writers for engaging in protected activity *by* withholding parole. The causative component of this claim is an adequately supported finding that the Board's policy or custom actually played a part in its denial of parole to Johnson (and other writ writers) and that but for the Board's policy or

28

custom Johnson (and other writ writers) would not have been denied parole.[19]  Nowhere, however, does the opinion below make any such determination.  Rather, the magistrate judge's opinion merely makes several references to instances where litigation activities appeared in parole files or were raised in interviews, and discusses the prisoners' perception of a linkage between parole denial and prisoner litigiousness.  There is *no finding* whatever that adverse consideration of writ writing by the Board actually played a part in its denial of parole to *any* particular inmate (or any identified group of inmates).  The absence of such a finding is especially significant given the background of Johnson and the other testifying prisoners, which raises substantial doubt as to

---

[19]In this regard, the dearth of statistical or other evidence showing the relative parole rates of writ writers versus the general prison population is damaging to Johnson's case.  While the absence of this evidence is not necessarily fatal to the retaliation theory, it does diminish Johnson's chances of proving causation.

We are not unmindful that "[a]n action motivated by retaliation for the exercise of a constitutionally protected right is actionable, even if the act, when taken for a different reason, might have been legitimate." *Woods,* 60 F.3d at 1165.  The situation of pretext, however, concerns the existence of retaliatory motivation, not causation.  Unless the complained-of action would not have taken place "but for" the retaliatory animus, then the retaliation claim has not been made out.  *Id.* at 1166.  Moreover, there must be a *finding* that retaliation was actually a "but for" cause of the complained of action (denial of parole). *Cf. St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (in claim for discriminatory discharge, there must be finding that discharge would not have occurred but for discriminatory animus, not merely that employer's stated nondiscriminatory reasons were pretextual).

29

whether this record would adequately support such a finding.[20]

Finally, we regard the evidence cited by the magistrate judge to demonstrate the "chilling" of protected rights system-wide as inadequate.  In support of his finding, the magistrate judge noted only the testimony of two witnesses:  the first, a single prisoner who once refused to receive legal mail because of his own, self-generated personal belief that this would improve his chances of obtaining parole;  the second, a staff attorney for the 14th District Court of Appeals in Houston, Texas, who related double hearsay statements purportedly originating from unidentified prisoners regarding their having "dismissed appeals of their own convictions," supposedly for parole-related reasons.[21]  *Johnson II,*

---

[20]Johnson was convicted of aggravated rape, involving the use of a knife, and began a sentence of lifetime imprisonment on April 26, 1977.  When his conviction was affirmed on appeal, five other pending indictments for rape were dismissed.  Johnson's criminal history includes half-a-dozen prior arrests, and he has escaped from several jails and prisons in both Texas and Illinois.  The bulk of the other prisoners who testified similarly face a long period of incarceration for violent offenses, typically murder and/or some variety of sexual assault, and have extensive criminal histories.  There is no substantial evidence that similarly situated prisoners with comparable (or worse) records, but who were *not* writ writers, were granted parole in the same general time frame that these prisoners were denied it.

[21]The only fair reading of this testimony is that it relates solely to direct appeals of conviction.  The staff counsel testified that "from the mail of the criminal appellants themselves" and from "personal conversations with some criminal defense attorneys" she was informed that appeals were withdrawn "because they felt they would not be considered for parole."  She also said "I think some would say they couldn't get it [parole]; others would say they wouldn't be considered."  She testified that in the court she worked for "about 55 to 60 percent of our appeals each year are criminal.  That's about 750, 800 appeals, all criminal."  Although she had been with the court some eight-and-a-half years, she began noticing the dismissal of appeals only about three years before her testimony.  She further stated

910 F.Supp. at 1215 n. 19. The magistrate judge's conclusion of

constitutional injury relies exclusively upon testimony concerning

that over the last two years "to make an estimate" she would say "about twenty" appeals—which would be less than 1.5 percent of the total—had been thus withdrawn. This witness gave no specifics: no names or descriptions of any particular cases, appellants, or defense counsel; no copy or extract from any pleading or correspondence; no particular words quoted or even paraphrased; no record or log, formal or otherwise, of dismissed appeals; and nothing to suggest that any of these some twenty appeals had (or were believed by anybody to have had) any arguable merit. There was no corroboration for her testimony. She admitted she had no knowledge whatever as to whether appeal precluded parole consideration or had any adverse effect on it, but was only testifying as to "the perception conveyed to" her by appellants and their attorneys. The witness did not recount any reason given her for the asserted beliefs of any of these some twenty appellants or their attorneys.

There is no evidence or finding that direct appeal of one's own conviction was regarded by anybody as "writ writing." Johnson in his brief states that "[t]he term writ writer refers to inmates who file or assist others in filing law suits, including writs of habeas corpus and attacks on conditions of confinement, seeking injunctive relief or monetary damages." There is no evidence as to whether or not the Board had any policy or practice to *postpone* either consideration of parole or the gathering of information for parole consideration purposes *until* the conviction resulting in the incarceration from which the inmate might be paroled became final on direct appeal. We observe that prisoners whose sentences are ten years or less remain in local custody pending completion of direct appeal unless they request or consent to transfer to TDCJ-ID. *See* Tex.Code Crim. Proc. Art. 42.09 sec. 4; *Ex Parte Rodriguez,* 597 S.W.2d 771 (Tex.Crim.App.1980). There is absolutely no evidence that the Board had any policy or practice to deny parole to an inmate once his conviction became final on appeal in whole or in part because the conviction had been appealed (or that whether the conviction was appealed was ever noted or discussed in the parole process).

In sum, the testimony of the staff attorney is essentially irrelevant. Moreover, it is far too attenuated and weak—speaking at most to her conclusory impression of why less than 1.5 percent of *criminal direct appeals* were voluntarily dismissed in a two-year period—to support any finding of a general chilling effect respecting writ writing.

the subjective appraisal of prisoners, with little or nothing in the way of objective evidence of actual injury.[22] *See United States v. Ramsey,* 431 U.S. 606, 622-624, 97 S.Ct. 1972, 1982, 52 L.Ed.2d 617 (1977) (to state actionable retaliation claim any "chill" of protected rights must be more than "minimal" and not "wholly subjective"). Moreover, the findings and evidence do not identify and address in this connection writ writing which is protectable under *Lewis* and *Tighe,* as distinguished from other writ writing. There is no evidence of any specific writ writing activity protectable under *Lewis* and *Tighe* which was actually foregone because of this purported "chill." The evidence discussed does not address any "chill" of the constitutionally protected right of access to the courts actually suffered by Johnson, the class representative, and is in any case insufficient to independently justify systemwide relief. *Lewis,* --- U.S. at ---- - ----, 116 S.Ct. at 2183-2184.

In sum, we conclude that due to the application of an improper legal standard concerning the extent to which the right of access to the courts protects particular litigation activities of prisoners, the judgment finding merit in Johnson's retaliation claim must be reversed and remanded for further consideration. On

---

[22]Johnson presented no evidence of reduced filings or filings below what would be normally expected. We observe that in the twelve months ending June 30, 1985, a total of 2,127 suits were filed by Texas prisoners in *federal* district court in Texas. In the twelve months ending June 30, 1990, the total was 2,457; in the twelve months ending September 30, 1995, it had reached 5,547. Annual Report of the Director of the Administrative Office of the U.S. Courts, 1985, 1990, 1995. It is hard to see that there has been any "chilling."

remand, findings must be made regarding the extent to which Johnson, the only named plaintiff, has engaged in constitutionally protected litigation activities and whether a Board custom or policy (formal or informal) authorizing or endorsing punitive retaliation for that protected activity *actually* played a part in its denial of his parole.[23]  And, if he would have been denied parole notwithstanding such consideration, an actionable claim is not established.  On the basis of these findings, the trial court should determine whether Johnson has suffered any injury which gives him standing to pursue relief in his capacity as class representative.  *Lewis,* --- U.S. at ----, 116 S.Ct. at 2183; *Arlington Heights,* , 429 U.S. at 262-266, 97 S.Ct. at 562-563; *Warth v. Seldin,* 422 U.S. 490, 502-503, 95 S.Ct. 2197, 2207, 45 L.Ed.2d 343 (1975).

If Johnson is found to have suffered redressable injury in his capacity as class representative, particularized findings will also be needed regarding the nature and scope of the litigation activities and constitutionally cognizable injuries, if any, suffered by contemporary class members.  Any conclusion that there is an actionable class injury sufficiently widespread to warrant systemic relief, whether under a retaliation theory or an equal protection theory, must rest on substantially more than the

---

[23]To order relief, whether under a retaliation theory or an equal protection theory, the magistrate judge must conclude in this connection, on the basis of adequate evidence, that consideration of protected litigation activities by individual Board members was undertaken pursuant to an established, albeit possibly unwritten or unofficial, custom or policy of the Board.

33

historical findings of other courts, such as the *Ruiz* court, and the subjective perceptions of class members. *Lewis,* --- U.S. at ----, 116 S.Ct. at 2184. Finally, any relief ordered under any theory is to be narrowly confined to remediation of any proven constitutional violation; no ordered relief may prohibit the Board's consideration of frivolous lawsuits or other nonprotected litigation activities in making parole determinations.

## 2. The Equal Protection Theory

The generally applicable legal standards are noted in our discussion under subpart II(C), *supra.* And, much of what we have said regarding the writ writer retaliation theory is likewise applicable to the writ writer equal protection theory, including the fact, fatal to the judgment below, that the magistrate judge proceeded on the erroneous assumption that any and all writ writing was constitutionally protected. We assume, *arguendo,* that a viable sub-class of the prison population—i.e. those who engage in constitutionally protected writ writing—may be shown.[24] To properly prove his claim under this theory, Johnson had to show that because of his constitutionally protected writ writing "he was treated unfairly compared to other prisoners who were [otherwise] similarly situated." *Hilliard v. Board of Pardons and Paroles,* 759 F.2d 1190, 1193 (5th Cir.1985) (citation omitted). The magistrate judge stated that "[a]ny distinction made between inmates who seek access to the courts and those who do not violates the equal protection

_____

[24]The class certified, however, was all present and future inmates of TDCJ-ID, not writ writers, much less those engaged in constitutionally protected writ writing.

34

clause." *Johnson II,* 910 F.Supp. at 1213.

However, the magistrate judge made no finding that in the case of Johnson, or of any other specific inmate, adverse consideration by the Board of his writ writing—much less his constitutionally protected writ writing—actually played a part in its denial of parole to him. Nor does the evidence show this. Further, no findings were made respecting the treatment meted out by the Board to comparable segments of the nonlitigious prison population, and the record does not provide an adequate basis for any such finding. There is no statistical or similar evidence whatever in the record comparing the parole rates of litigious and nonlitigious prisoners, let alone a comparison of those who engage in *constitutionally* protected writ writing and those who do not. Even were Johnson able to show that the Board had a largely negative view of writ writing in general, he does not appear to have demonstrated any actual "disparate" impact upon any "class" of those engaging in constitutionally protected writ writing. *McCleskey,* 481 U.S. at 292-293, 107 S.Ct. at 1767 (part of Equal Protection challenge is proof that "purposeful discrimination "had a discriminatory effect' "), *quoting Wayte v. United States,* 470 U.S. 598, 608-609, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985).

We further note that although litigation related activity tangentially defines the parameters of the allegedly aggrieved class, the practice actually challenged directly affects only parole consideration and not a prisoner's ability to file a lawsuit or assist another in doing so. *Compare Lyng v. Castillo,* 477 U.S.

35

635, 637-642, 106 S.Ct. 2727, 2729-2731, 91 L.Ed.2d 527 (1986); *Richard v. Hinson,* 70 F.3d 415, 417 (5th Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 2522, 135 L.Ed.2d 1047 (1996); *Wayne v. Tennessee Valley Authority,* 730 F.2d 392, 403-404 (5th Cir.1984), *cert. denied,* 469 U.S. 1159, 105 S.Ct. 908, 83 L.Ed.2d 922 (1985). And, not all prisoner litigation activity is protected. *Lewis; Tighe.* Thus, any burden which customary consideration in the parole process of litigation activity generally may impose upon a "fundamental right" is "incidental" and does not warrant strict scrutiny under an equal protection analysis. *Planned Parenthood of Southeastern Penn. v. Casey,* 505 U.S. 833, 872-874, 112 S.Ct. 2791, 2818-2819 (1992); *Younger v. Harris,* 401 U.S. 37, 49-52, 91 S.Ct. 746, 753-754, 27 L.Ed.2d 669 (1971). Hence, for equal protection purposes only a conceivable rational relationship is required. *Stern,* 778 F.2d at 1054. It is simply not irrational to consider general litigiousness, or the filing (or aiding in the filing or the fomenting) of frivolous law suits, or concentration on being a "jail house lawyer," or the like, as anti-social activity which may to some extent interfere with and adversely reflect on a prisoner's rehabilitation.[25] If in a rare, given instance such a general

---

[25]*Cf., e.g.,* Justice Powell's observations in *Schneckloth v. Bustamonte,* 412 U.S. 218, 260-262, 93 S.Ct. 2041, 2065, 36 L.Ed.2d 854 (1973) (Powell, J., concurring, joined by the Chief Justice and Justice Rehnquist):

> "At some point the law must convey to those in custody that a wrong has been committed, that consequent punishment has been imposed, that one should no longer look back with the view to resurrecting every imaginable basis for further litigation but rather should look forward to rehabilitation and to becoming a constructive

approach happens to result in the Board's adverse consideration of a given inmate's *constitutionally* protected writ writing activity having *actually* played a part in its denial of parole to that particular inmate,[26] then that may be addressed and redressed under standards essentially comparable to those applicable to the retaliation theory.

We accordingly reverse and remand the magistrate judge's ruling on the "writ writer" claim.

## IV. The Attorneys' Fee Award

Because the magistrate judge's judgment has been reversed, Johnson can no longer be considered a "prevailing party" entitled to attorneys' fees. 42 U.S.C. § 1988. The award of attorneys' fees is accordingly vacated.

### Conclusion

The magistrate judge's ruling on the protest letter claim is reversed and on remand that claim shall be dismissed with prejudice. The magistrate judge's judgment on the writ writer claim is reversed and remanded for reconsideration and/or further proceedings in accordance herewith. The magistrate judge's award

---

citizen." (Footnote omitted).

Justice Blackmun stated that he agreed "with nearly all that Mr. Justice Powell has to say in his detailed and persuasive concurring opinion." *Id.* at 249, 93 S.Ct. at 2059. This portion of Justice Powell's *Schneckloth* concurrence was cited with approval in *Kuhlmann v. Wilson,* 477 U.S. 436, 451–453, 106 S.Ct. 2616, 2626, 91 L.Ed.2d 364 (1986).

[26]There is no finding and no evidence tending to indicate even approximately what portion of prisoner writ writing is constitutionally protected. Our experience would suggest that it is extremely small. *See* note 17, *supra.*

of attorney's fees is vacated.

REVERSED in PART;  VACATED in PART;  and REMANDED.