Jaime COVARRUBIAS

v.

Victoria WALLACE, et al.

Civil Action No. 6:12cv156.

United States District Court,
E.D. Texas,
Tyler Division.

Nov. 6, 2012.

Jaime Covarrubias, Tennessee Colony, TX, pro se.

Johnathan David Stone, Office of the Attorney General, Austin, TX, for Victoria Wallace, et al.

*MEMORANDUM ADOPTING INITIAL REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE*

MICHAEL H. SCHNEIDER, District Judge.

The Plaintiff Jaime Covarrubias, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se,* filed this lawsuit under 42 U.S.C. § 1983 complaining of alleged violations of his constitutional rights. The lawsuit was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges. As defendants, Covarrubias named Victoria Wallace, John Wilson, Gabriel Obrigbo, Officer Gladney, Officer Chamberlain, Sgt. Johnson, Captain McDowell, counsel substitute B. Childress, Wardens Robert Herrera and B. Gordy, central grievance coordinator C. Lawson, and certain unknown defendants, including persons identified as the major use of force investigator, an officer who helped tackle Covarrubias, a supervisor, a designee of the Warden, the Executive Director of TDCJ, the regional director, and an investigator for the Office of the Ombudsman.

Covarrubias complained of an alleged use of force which occurred on April 26, 2010. After review of the pleadings and the testimony at an evidentiary hearing, the Magistrate Judge issued an Initial Report recommending that Covarrubias be allowed to proceed on his claims against officers Wallace, Wilson, and Obrigbo, and that the remaining claims and defendants be dismissed, Covarrubias filed objections to this Initial Report on October 19, 2012.

In his objections, Covarrubias first complains of minor alleged omissions from the Report, such as the fact that the Magistrate Judge did not mention that the defendant Wallace was "wearing a sly smile." He also complains of the fact that the TDCJ records were not provided to him for examination; however, when the Magistrate Judge ordered the remaining defendants to answer the lawsuit, she also implemented a discovery plan for the case, under which Covarrubias will receive disclosure of all documents relevant to any party's claims or defenses. These objections are without merit.

Covarrubias complains at length that he was the victim of retaliation, explaining that his right to be free from retaliation was "obstructed" by the defendants. He states that "not because these defendants had any retaliatory animus, but because their acts of making false statements during the state's proceedings covered up Wallace's act of retaliation." The Magistrate Judge stated that Covarrubias' claim that Wallace, and possibly Wilson and Obrigbo, retaliated against him requires further judicial proceedings.

To the extent that Covarrubias claims that any of the other named defendants retaliated against him, his claim is without merit. As the Magistrate Judge stated, Covarrubias did not make any retaliatory motive on the part of these persons clear, and Covarrubias expressly says "not because these defendants had any retaliatory animus . . ." An intent to retaliate is an essential element of a retaliation claim. *Johnson v. Rodriguez,* 110 F.3d 299, 310 (5th Cir.1997). This objection is without merit.

Next, Covarrubias argues that his claim of conspiracy should be allowed to go forward because various defendants conspired to make false statements in the disciplinary proceedings against him. As the Magistrate Judge stated, no case has held that the making of a false statement during a disciplinary proceeding itself violates any right protected by the Constitution or laws of the United States. Covarrubias' argument that this alleged conspiracy prevented a full and open disclosure of facts crucial to his cause of action, as well as relief in his favor at the administrative level, is creative but unavailing. This objection is without merit.

Covarrubias further states that he set out a Fourth Amendment claim, but that he believes that the claim may have been construed as an Eighth Amendment cruel and unusual punishment claim. In his complaint, he expresses his Fourth Amendment claims as being an "unreasonable seizure" caused by the use of chemical agents and his being tackled by the defendants. These claims are properly analyzed under the Eighth Amendment's prohibition against cruel and unusual punishment; the application of Fourth Amendment standards to excessive force cases is proper in the context of an arrest or investigatory stop of a free citizen, a circumstance which does not exist in this case. *See Graham v. Connor,* 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The Magistrate Judge did not err, and Covarrubias' claim on this point is without merit.

Covarrubias goes on to object to the Magistrate Judge's dismissal of Gladney and Chamberlain for failing to inter-

vene, saying that "it is enough to allege facts that these defendants did not try to prevent, or did not try to stop, or tried to prevent or stop but did not try as hard as [they] should have, the violation from occurring." He states that "an inference of time to intervene existed prior to, during, or after the aggregate use of force." Covarrubias concedes that "there may be times when a defendant cannot, physically, due to factors not in one's control" intervene, or that there may be times when "it is advantageous not to physically attempt to stop the violation from occurring or continuing," but nonetheless argues that it is a "question for the factfinder to answer in light of the circumstances." Based upon Covarrubias' pleadings and testimony, the Magistrate Judge concluded that Gladney and Chamberlain did not have authority to intervene in the incident and did not have a realistic opportunity to intervene even if they did have the authority to do so. Covarrubias' objections fail to show that the Magistrate Judge erred in this regard.

Covarrubias states that during the time that he was assaulted, other inmates were being assaulted by guards, supervisors were not readily available, recently hired correctional officers were in control of cell blocks and did not know what to do, and staff shortages were common. This lawsuit concerns the alleged use of force on Covarrubias on April 26, 2010, and he cannot raise claims regarding alleged violations of other persons' rights. *See Coon v. Ledbetter,* 780 F.2d 1158, 1159 (5th Cir. 1986) (persons claiming a deprivation of constitutional rights are required to show a deprivation of their personal rights). This objection is without merit.

At one point in his objections, Covarrubias suggests that the unknown person who tackled him might have been Sgt. Johnson; however, his pleadings and testimony indicate that Johnson had left before the use of force, and he indicates in his complaint that he was tackled by three persons, stating that "these two [Wallace and Wilson] plus Obrigbo then tackled Plaintiff piling on top of him constricting his breathing." The Magistrate Judge ordered these three individuals—Wallace, Wilson, and Obrigbo—to answer the lawsuit. Covarrubias has not shown that this decision was in error.

Covarrubias next returns to the conspiracy issue, arguing that the intra-corporate conspiracy doctrine does not bar his claim because the actions of the individual defendants were not sanctioned by TDCJ. Even were this argument correct, Covarrubias goes on to argue that the defendants "failed to adhere to policy which required them to give complete, accurate, and truthful statements in the proceedings complained of." A conspiracy to violate TDCJ policy and to give false statements in a prison disciplinary proceeding does not amount to a constitutional violation even were it not barred by the intracorporate conspiracy doctrine, because neither violations of prison policy nor the giving of such false statements are themselves constitutional violations. The Fifth Circuit has stated that to recover on a claim of a conspiracy, there must be an actual deprivation of a constitutional right; a mere conspiracy to deprive is insufficient. *Villanueva v. McInnis,* 723 F.2d 414, 418 (5th Cir.1984). This objection is without merit.

Next, Covarrubias asserts a "substantive due process" claim in the fact that he was convicted in the disciplinary hearing based upon "false testimony." He asserts that this was a "failure to perform a mandatory non-discretionary statutory or regulatory duty" which "arbitrarily deprives Plaintiff of an entitlement in violation of substantive due process requirements." The Magistrate Judge correctly

determined that the punishment imposed in the disciplinary case did not deprive Covarrubias of any constitutionally protected liberty interests under *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995) and *Malchi v. Thaler,* 211 F.3d 953, 959 (5th Cir.2000). Covarrubias' objection on this point is without merit.

Covarrubias objects to the Magistrate Judge's characterization of counsel substitutes as "nonstate actors," arguing that private conduct may engender liability under Section 1983 if the person is "a willing participant in joint action with the State or its agents." While this statement may be correct as a matter of abstract law, Covarrubias has offered nothing to show that his counsel substitute was a "willing participant in joint action." Even if his counsel substitute could somehow be held liable under Section 1983, Covarrubias has not shown that any action taken by his counsel substitute deprived him of a right protected by the Constitution or laws of the United States, in light of the fact that the disciplinary proceeding did not deprive him of a constitutionally protected liberty interest. This objection is without merit.

Finally, Covarrubias argues that the failure to resolve grievances in his favor can amount to a constitutional violation where the responses to his grievances "were formulated with litigation in mind." The Fifth Circuit has expressly held that prisoners have no liberty interest in having grievances resolved to their satisfaction, and Covarrubias cannot evade this case simply by supposing that the actions taken on his grievances and letters was done with litigation in mind. *See Geiger v. Jowers,* 404 F.3d 371, 373–74 (5th Cir.2005). This objection is without merit.

The Court has conducted a careful *de novo* review of the Plaintiff's pleadings and testimony and the Initial Report of the Magistrate Judge. Upon such review, the Court has determined that the Initial Report of the Magistrate Judge is correct and that the Plaintiff's objections are without merit. It is accordingly

ORDERED that the Plaintiff's objections are overruled and the Initial Report of the Magistrate Judge (docket no. 18) is ADOPTED as the opinion of the District Court. It is further

ORDERED that the Plaintiff's claims against the Defendants Officer Gladney, Officer Chamberlain, Sgt. Johnson, Captain McDowell, counsel substitute B. Childress, Wardens Robert Herrera and B. Gordy, central grievance coordinator C. Lawson, and the unknown defendants are hereby DISMISSED with prejudice as frivolous and for failure to state a claim upon which relief may be granted. 28 U.S.C. § 1915A. The dismissal of these claims and parties shall not count as a strike for purposes of 28 U.S.C. § 1915(g) unless otherwise ordered by the Court, and shall have no effect upon the Plaintiff's claims against officers Wallace, Wilson, and Obrigbo.

**It is SO ORDERED.**

## *INITIAL REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE*

JUDITH K. GUTHRIE, United States Magistrate Judge.

The Plaintiff Jaime Covarrubias, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se,* filed this lawsuit complaining of alleged violations of his constitutional rights. The lawsuit was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges. He names 18 defen-

dants in his lawsuit, including Victoria Wallace, John Wilson, Gabriel Obrigbo, Officer Gladney, Sgt. Johnson, Captain McDowell, counsel substitute B. Childress, Wardens Robert Herrera and B. Gordy, central grievance coordinator C. Lawson, and seven unknown defendants, including persons identified as the major use of force investigator, an officer who helped tackle Covarrubias, a supervisor, a designee of the Warden, the Executive Director of TDCJ, the regional director, and an investigator for the Office of the Ombudsman.

In his complaint and at an evidentiary hearing, Covarrubias testified that on April 26, 2010, he was at the Beto Unit on M Wing. He was waiting for a scheduled administrative lay-in, which had been authorized by Officer Obrigbo; Covarrubias states that he was waiting behind the stairs, which he says was the common waiting spot for lay-ins.

At 3:00 p.m., the time of his lay-in, Covarrubias states that Officer Victoria Wallace did not allow him to leave the wing. He asked for a supervisor, but she ignored him. Covarrubias saw other inmates leaving the wing for other activities and asked Obrigbo to call a supervisor, but Obrigbo told him to wait behind the stairs.

Covarrubias saw Sgt. Johnson and waved him over. Johnson listened to him, looked over at Wallace, shook his head, and walked away without doing anything. About ten minutes later, Covarrubias was still waiting behind the stairs when Officer John Wilson came to pick up the inmates going to college. Covarrubias asked Wilson to call for a supervisor, but to no avail.

After Covarrubias had waited behind the stairs for some 20 to 40 minutes, no ranking officer had come. Rather than calling for a supervisor, Officer Wallace told picket officers Chamberlain and Gladney to come out of the picket and hold her keys for her. Wallace then told Wilson to come with her and approached Covarrubias; Wilson was directly in front of him and Wallace was to his left, with the stairs on his right.

Wallace told Covarrubias to go to the dayroom, sarcastically adding that she would summon a supervisor if he cooperated. During this discussion, Wallace pushed Covarrubias from behind, up against the stairs. Covarrubias states that he was not being confrontational or aggressive, and that he had his arms at his sides.

After being pushed, Covarrubias told Wallace that he would go to the dayroom, but she replied "too late." He says that Wallace's physical movements "escalated from the initial push to grabbing, yanking, and wrapping her arm around Plaintiff's neck and face while jerking him backwards." He held on to the bars and turned his head to keep his face from being cut, and Wallace continued to pull on him. She asked Wilson to help her, and Wilson pulled on his right arm. Covarrubias let go of the stairwell bars on his own accord and allowed Wilson to take hold of his right arm.

Wallace continued to hold his left arm with both of her hands, and then released her left hand. She reached for her pepper spray and fired a two to three second burst into Covarrubias' right eye. Covarrubias states that he was standing passively, with both of his arms being restrained and making no aggressive moves. After Wallace shot him with the pepper spray, she and Wilson released Covarrubias, grabbed him, and released him again.

Covarrubias tried to alleviate the pain, irritation, and burning in his eye by rubbing and patting his face. He was tackled by "what seemed to be at least three officers" who crushed him to the floor with their body weight, These officers used their elbows, knees, arms, and hands on his back, legs, arms, and face as they piled

on him, pressing his face into the concrete. At one point in his complaint, Covarrubias says that "these two [Wallace and Wilson] plus Obrigbo then tackled Plaintiff piling on top of him constricting his breathing." Wallace straddled his back, screaming "stop resisting" even though he was not resisting.

Covarrubias states that he suffered scratches, bruising, burning, and pain, as well as mental and emotional injury. He was handcuffed and taken to the infirmary, after which he went to prehearing detention, where he continued to suffer pain, discomfort, and a burning sensation, because no decontamination procedures were provided.

Wallace filed a false disciplinary report against Covarrubias, charging that he had attempted to grab her hand. The next day, a counsel substitute named Childress was appointed to assist him. Covarrubias named Wilson as a witness, and asked that Obrigbo be interviewed as well. Ten days later, a disciplinary hearing was held. Childress presented a witness statement from Wilson alleging that he was off work on the day of the incident, even though Wilson had participated in the incident. Childress also said that Covarrubias had not requested a statement from Obrigbo, but that officer was present for the hearing.

Gladney and Chamberlain submitted statements saying that they had not seen anything. Wallace testified falsely that Wilson was not present and did not participate, and stated the events in "an improbable manner accommodating her initial false statements that Wilson did not assist her." Obrigbo testified that Wilson was not there and that the allegation that Covarrubias had attempted an assault was true. Captain McDowell, the disciplinary hearing officer, would not allow Covarrubias to ask Obrigbo with which hand Wallace had sprayed him; Wallace had testified that Covarrubias grabbed her left hand and so she sprayed him with her right hand.

Covarrubias was found guilty of attempted assault. He filed grievances on the incident itself and on the disciplinary case. Warden Herrera upheld the disciplinary case at the Step One level, and C. Lawson upheld the case at the Step Two level.

Covarrubias stated that his brother Victor sent a complaint to the TDCJ Office of the Ombudsman, as well as a complaint to the Director of TDCJ. Victor also telephoned the Director. Covarrubias had informal conversations with Wilson, and information gleaned from these conversations was also sent to the Ombudsman. Nonetheless, the Office of the Ombudsman responded that a major use of force violation would be acted on and that "it was found that all due process and procedural considerations" were afforded to Covarrubias. He says that affidavits can be obtained from some 50 inmates who witnessed the incident.

Finally, Covarrubias states that he has learned "upon information and belief" that Wallace had assaulted other inmates, including one with a cell door and another by "gassing him on his back." He asserts that it is "common knowledge" that Wallace is aggressive, although she was only recently hired.

*The TDCJ Records*

In reviewing the TDCJ records, the Court will assume that Covarrubias' pleadings and testimony are true for purposes of this Initial Report, and will disregard any factual assertions made at the *Spears* hearing or contained in the prison records which contradict factual assertions made by Covarrubias. *See generally Wilson v. Barrientos,* 926 F.2d 480, 482–83 (5th Cir. 1991).

According to the investigation conducted by TDCJ, Covarrubias confronted Wallace about going to the chapel and was told to go to the dayroom due to the activity on the wing. Later, Obrigbo was conducting offender moves and opened the dayroom door, and Covarrubias exited the dayroom. Obrigbo told him several times to return to the dayroom but Covarrubias refused. Wallace came onto the wing and told Covarrubias to comply with orders or he would receive a case, but Covarrubias continued to refuse. Wallace ordered Covarrubias to turn around and submit to hand restraints, and Covarrubias turned around.

As Wallace tried to apply the restraints, Covarrubias turned and grabbed her hand, taking hold of the stairway railing with his other hand. Wallace tried to pull away but Covarrubias would not let go. Officer Johnnie Wilson had given Wallace his restraints and saw the commotion, and came over to assist. Wallace managed to free her left hand and sprayed Covarrubias in the face with chemical agents. Officer Cindy Gladney was in the picket and called out for assistance and a video camera. Wilson then took hold of Covarrubias' upper body and moved Covarrubias' legs out from under him with his right leg, bringing Covarrubias to the floor with Wallace's help. Obrigbo came over and restrained Covarrubias' legs. Officer Kevin Burton arrived and was instructed to take over for Wallace and serve as escorting officer. Burton helped Covarrubias to his feet and took him to the infirmary. There, Covarrubias received a use of force examination which showed no injuries.

Lt. Blake took four photographs of Covarrubias and instructed him on decontamination procedures for the chemical agents. Covarrubias was taken out of the infirmary and over to X Wing. He was placed in a cell and the use of force was terminated.

Covarrubias' medical records show that no injuries were noted at the use of force examination and he denied any injuries. There are no indications in the medical records that he required any followup medical care or complained of any injuries at a later date as a result of the incident.

Covarrubias received disciplinary case no. 20100238068, charging him with attempting to assault Officer Wallace. The written record of this hearing shows that Covarrubias testified that Wallace denied his request to leave the wing and he asked for rank. He denied assaulting Wallace and said that he was not being confrontational. Wallace testified that Covarrubias began resisting when she tried to handcuff him and that he grabbed her arm. These records show that it was an officer named T. Wilson who gave a statement saying that it was his day off. Office Chamberlain's statement says that she did not see anything, and Officer Gladney said that when she saw Wallace struggling with Covarrubias, she called for additional help. Inmate Hinajas said that he did not see anything, and inmates Hatcher and Montano gave statements indicating that Wallace had assaulted Covarrubias.

Covarrubias was found guilty of the disciplinary case and sentenced to 45 days of cell and commissary restrictions, a reduction in classification status from State Approved Trusty III to Line Class I, and the loss of 180 days of good time credits. He appealed this disciplinary conviction through Step One and Step Two of the grievance process, but these appeals were denied. As noted above, the Court presumes that Covarrubias' pleadings and testimony are true for purposes of this Initial Report, and will disregard all factual assertions made in the TDCJ records which contradict statements made by Covarrubias.

*Legal Standards and Analysis*

Covarrubias states that Officer Wallace used excessive force on him, assisted by Officer John Wilson and Officer Obrigbo. He also indicates that this use of force was done in retaliation for his requesting a supervisor and for "attempts to informally resolve a complaint." These claims require further judicial proceedings. *See Wilkins v. Gaddy,* 559 U.S. 34, 130 S.Ct. 1175, 1178–79, 175 L.Ed.2d 995 (2010).

Covarrubias states that Officer Gladney and Officer Chamberlain, the picket officers, failed to intervene to protect him from a use of force. The Fifth Circuit has held that a supervisory officer may be held liable under Section 1983 if he refuses to intervene when subordinates are beating an inmate in his presence. *Harris v. Chanclor,* 537 F.2d 203, 205 (1976). However, where a use of force is so rapid that there is no realistic opportunity to intervene, there is no liability on the part of officers who fail to do so. *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2nd Cir.1988).

In this case, Covarrubias describes Wallace as the "commanding correctional officer" for the wing block (M, N, O, and P wings), and so Gladney and Chamberlain were not "supervisory officers" as to Wallace. Even if these officers had authority to intervene, however, Covarrubias has failed to show that they had a realistic opportunity to do so. His statement and testimony shows that Wallace handed her keys to Gladney and Chamberlain, came over to the stairs, confronted Wallace, pushed him, grabbed him, and jerked him backwards. He then let go of the stairwell bars so Wilson could take hold of his right arm, whereupon Wallace sprayed him with pepper spray. This rapid sequence of events could have left little if any time for Gladney and Chamberlain to leave the picket area (assuming that they could leave their post), come to the scene of the altercation, and intervene to stop Wallace. Covarrubias' claim of liability against Gladney and Chamberlain for failure to intervene is without merit.

Covarrubias also complained that Gladney and Chamberlain made false statements during the disciplinary proceeding, in that they said that they did not see the incident when in fact they did. No case has held that the making of a false statement during a prison disciplinary proceeding itself violates any right protected by the Constitution or laws of the United States. *See, e.g., Spellmon v. Price,* 100 F.3d 953, 1996 WL 625422 (5th Cir., October 10, 1996) (rejecting claim that prisoner has a liberty interest in not having false statements, reports, and evidence presented at a disciplinary hearing); *Crumbley v. Dawson,* civil action no. 9:09cv14, 2010 WL 2209189 (E.D.Tex., May 28, 2010), *aff'd* 485 Fed.Appx. 1 (5th Cir.2012) (citing *Briscoe v. LaHue,* 460 U.S. 325, 330–31, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) in holding that there was no cause of action against an officer who changed his testimony so as to testify falsely in a prison disciplinary proceeding). These claims are without merit.

Similarly, Covarrubias contends that Gladney and Chamberlain conspired with Wallace, Wilson, Obrigbo, and one or more unknown defendants by making false statements during the use of force investigation and the disciplinary proceeding. All of these individuals are members of a single entity, the Texas Department of Criminal Justice, Correctional Institutions Division, and so a conspiracy claim against them is barred by the intra-corporate conspiracy doctrine. *Reynosa v. Wood,* 134 F.3d 369, 1997 WL 811828 (5th Cir., December 18, 1997). This is because where all of the defendants are members of the same collective entity, the conspiracy does not involve two or more people. *Hilliard v. Ferguson,* 30 F.3d 649, 653 (5th Cir. 1994); *accord, Moody v. Jefferson Parish*

*School Bd.,* 803 F.Supp. 1158, 1166 (E.D.La.1992), *aff'd* 2 F.3d 604 (5th Cir. 1993) (school board, principal, vice-principal, and various teachers were all employed by the school board and thus were a single entity for purposes of a conspiracy claim). All of the Defendants in the present case are employed by TDCJ and thus are a single entity, which is incapable of conspiring with itself. This is true even where the Defendants are sued in their individual capacities. *Collins v. Bauer,* civil action no. 3:11cv887, 2012 WL 443010 (N.D.Tex., January 23, 2012); *Veney v. Ojeda,* 321 F.Supp.2d 733, 748 (E.D.Va. 2004) (police officers were agents of a single entity and thus could not conspire with one another, even if sued in their individual capacities).

Even were this not the case, Covarrubias' conspiracy claim nonetheless lacks merit. The Fifth Circuit has explained that specific facts must be pled when a conspiracy is alleged; mere conclusory allegations will not suffice. *Hale v. Harney,* 786 F.2d 688, 690 (5th Cir.1986). In pleading these specific facts, the Plaintiff must allege the operative facts of the alleged conspiracy. *Lynch v. Cannatella,* 810 F.2d 1363, 1369–70 (5th Cir.1987). In addition, the Fifth Circuit has noted that "charges as to such conspiracies must be based on substantial and affirmative allegations, and no mere gossamer web of conclusion or inference, as here, trifles light as air," will suffice to sustain a claim of conspiracy. *Crummer Company v. Du Pont,* 223 F.2d 238, 245 (5th Cir.1955, reh. den.).

In this case, Covarrubias offers nothing to substantiate his claim of a conspiracy beyond the bare assertion that one existed. This is not sufficient. Covarrubias' conspiracy claims are without merit.

Covarrubias further appears to contend that Gladney and Chamberlain, as well as one or more of the unknown defendants, made their allegedly false statements in retaliation against him, although it is not clear what the alleged retaliation was for. The Fifth Circuit has held that the elements of a claim under a theory of retaliation are the invocation of a specific constitutional right, the defendant's intent to retaliate against the plaintiff for his exercise of that right, a retaliatory adverse act, and causation, which is a showing that but for the retaliatory motive, the action complained of would not have occurred. *Johnson v. Rodriguez,* 110 F.3d 299, 310 (5th Cir.1997). This requirement places a heavy burden upon inmates, because mere conclusionary allegations will not suffice; instead, the inmate must produce direct evidence of retaliation or, the more probable scenario, a chronology of events from which retaliation may plausibly be inferred. *Woods v. Smith,* 60 F.3d 1161, 1166 (5th Cir.1995); *see also Whittington v. Lynaugh,* 842 F.2d 818, 820 (5th Cir. 1988) (a prisoner who asserts a retaliation claim must assert specific facts; mere conclusory allegations are not enough). The relevant showing must be more than the prisoner's personal belief that he is the victim of retaliation. *Johnson,* 110 F.3d at 310, *citing Woods v. Edwards,* 51 F.3d 577, 580 (5th Cir.1995).

Covarrubias has wholly failed to set out any specific facts, or a chronology of events, from which it may plausibly be inferred that Gladney, Chamberlain, or any of the unknown defendants were retaliating against him. He offers nothing more than the fact that they gave statements to the effect that they did not see the incident, which statements Covarrubias does not believe are true. Nor does he offer anything to show that these officers had retaliatory intent or that but for an alleged retaliatory motive, they would not have given these statements. His claim of retaliation against Gladney, Chamberlain,

and the unknown defendant or defendants is without merit.

The next named defendant is Sgt. Johnson. Covarrubias says that when Wallace would not let him leave the wing for his lay-in, he spoke to Johnson, who glanced over at Wallace, shook his head, and walked away. Covarrubias states that Johnson's "failure to exercise his supervisory authority constituted deliberate indifference. A risk was created by subordinates, e.g. Wallace's acts, character, policy violation, that he failed to prevent, because he did not take easily available measures (give a direct order)."

Prison officials have a duty not to be deliberately indifferent to the safety of their inmates. *Johnston v. Lucas,* 786 F.2d 1254, 1260 (5th Cir.1986); *Jacquez v. Procunier,* 801 F.2d 789, 792 (5th Cir. 1986). A showing of mere negligent indifference is not enough for a constitutional claim. *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986).

More recently, the Supreme Court has explained that

> [A] prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference....
>
> But an official's failure to alleviate a significant risk which he should have perceived, but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Farmer v. Brennan,* 511 U.S. 825, 837–38, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994); *see Reeves v. Collins,* 27 F.3d 174, 176 (5th Cir.1994).

Covarrubias has failed to show that Johnson knew of and disregarded an excessive risk to his health or safety. His pleadings show that Johnson arrived and left before the use of force ensued; the fact that Johnson did not take the action which Covarrubias deemed appropriate does not show that the officer was deliberately indifferent to his safety, nor that there was even any indication that the officer could have known that a use of force was imminent. Covarrubias' claim against Sgt. Johnson is without merit.

The next listed defendant is Captain McDowell, the disciplinary hearing officer. Covarrubias complains that Captain McDowell denied him substantive due process by finding him guilty based on false evidence, false testimony, and "fundamentally unfair treatment in deprivation of liberty." However, Covarrubias has failed to show that the punishment imposed in the disciplinary case deprived him of any constitutionally protected liberty interest.

The Supreme Court has held that the States may, under certain circumstances, create liberty interests which are protected by the Due Process Clause, but these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 2301, 132 L.Ed.2d 418 (1995).

In *Sandin,* a Hawaii prison inmate received a disciplinary case for "high misconduct" and two others for "low moderate misconduct." He appeared before the disciplinary hearing panel, but was not permitted to call witnesses. He was convicted of the charges and sentenced to 30 days of disciplinary segregation on the high mis-

conduct charge and four hours of disciplinary segregation for each of the other two charges, served concurrently with the 30 days of confinement. Conner brought suit, claiming a denial of procedural due process in connection with the disciplinary hearing.

The trial court granted summary judgment in favor of the defendants, but was reversed on appeal. The Ninth Circuit held that Conner had a liberty interest in remaining free from disciplinary segregation and that there was a disputed question of fact with respect to whether or not Conner received all of the process due under the Supreme Court's decision in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

In analyzing the plaintiff's claim, the Supreme Court first examined the state of the law, beginning with *Wolff.* There, the issue involved good time credits which bestowed mandatory sentence reductions and a regulation which provided that these credits could be revoked only for "flagrant or serious misconduct." *Wolff,* 418 U.S. at 545–46 and nn. 5 & 6, 94 S.Ct. 2963. The Court held that the statutory provisions in question created a liberty interest in a shortened sentence, which was an interest of "real substance" requiring minimum procedures necessary to reach an "accommodation between institutional needs and objectives and the provisions of the Constitution." *Wolff,* 418 U.S. at 556–57, 94 S.Ct. 2963.

*Wolff* was followed by *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). There, Massachusetts inmates complained of transfers from a medium security facility to a maximum security prison which had substantially less favorable conditions. These transfers did not involve the loss of good time credits or any period of disciplinary confinement. *Meachum,* 427 U.S. at 222, 96 S.Ct. 2532.

In analyzing the claim, the Court first laid down the principle that the Due Process Clause does not protect every change in the conditions of confinement which has a substantial adverse effect upon a prisoner. *Meachum,* 427 U.S. at 224, 96 S.Ct. 2532. Further, the Court held that the Due Process Clause itself does not create a liberty interest in prisoners being free from intrastate prison transfers because transfer to a maximum security facility, even one with more burdensome conditions, is "within the normal limits or range of custody which the conviction has authorized the State to impose." *Meachum,* 427 U.S. at 225, 96 S.Ct. 2532. The Court said that *Wolff* was distinguishable because the protected liberty interest in good time credit was created by state law, while in *Meachum,* no law stripped away the discretion of state officials to transfer inmates for any reason or none at all. *Meachum,* 427 U.S. at 228, 96 S.Ct. 2532.

The cases after *Meachum* seized upon this dictum to place ever greater emphasis upon the dichotomy between mandatory and discretionary state regulations. *See Sandin,* 115 S.Ct. at 2298. This approach came to fruition in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In *Hewitt,* the Court did not look to whether the State had created an interest of "real substance," as in *Wolff;* instead, the Court posed the question of whether the State had gone beyond issuing mere procedural guidelines and had used language of an unmistakably mandatory character such that an incursion upon liberty would not occur absent specified substantive predicates. *Sandin,* 115 S.Ct. at 2298, *quoting Hewitt,* 459 U.S. at 471–72, 103 S.Ct. 864.

The use of this methodology meant that inmates no longer were required to show an interest of "real substance" or that they faced a "grievous loss" of liberty retained

after incarceration. *Sandin,* 115 S.Ct. at 2298, *citing Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (focusing on "grievous loss"). Instead, the inquiry had shifted from the nature of the deprivation to the language of the regulation. *Sandin,* 115 S.Ct. at 2299; *see Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) (liberty interest in interstate transfer revolved around language of regulation); *Kentucky Department of Corrections v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (liberty interest in visitation privileges revolved around language of regulation).

These holdings were routinely followed by the circuit courts, including the Fifth Circuit. *See, e.g., Giovanni v. Lynn,* 48 F.3d 908 (5th Cir.1995) (analyzing the liberty interest presented in the context of the language of the regulations involved, citing *Olim* and *Thompson* ).

In *Sandin,* however, the Supreme Court announced that this analytical framework has "strayed from the real concerns undergirding the liberty protected by the Due Process Clause" and that "it is time to return" to the principles set out in *Wolff* and *Meachum. Sandin,* 115 S.Ct. at 2300. Rather than examining the language of the regulations, the Court stated that the operative interest involved was the nature of the deprivation. Hence, the Court specifically disapproved of the mandatory or discretionary language analysis set out in *Hewitt* and its progeny. *Sandin,* 115 S.Ct. at 2300 and n. 5.

Instead, the Court held that the States may, under certain circumstances, create liberty interests which are protected by the Due Process Clause, but these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. *Sandin,* 115 S.Ct. at 2301.

*Sandin* cited *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (transfer to mental hospital triggers Due Process Clause) and *Washington v. Harper,* 494 U.S. 210, 221–222, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (involuntary administration of psychotropic drugs implicates Due Process Clause), as examples of restraints which trigger the Clause of their own force, but stated that the incarceration in disciplinary segregation present in that case did not create the type of deprivation in which the State might have created a liberty interest. *Sandin,* 115 S.Ct. at 2297 n. 4, 2299–300. As a result, the Court held that neither the Hawaii prison regulation at issue nor the Due Process Clause itself afforded the inmate a protected liberty interest entitling him to the procedural protections of *Wolff. Sandin,* 115 S.Ct. at 2302. The Court concluded that the fact that Conner was not permitted to call witnesses at his disciplinary hearing was not sufficient to accord him relief because no protected liberty interest was at stake.

In this case, the punishments imposed upon Covarrubias included cell and commissary restrictions and the loss of classification status, as well as the forfeiture of 180 days of good time credits. The punishments of cell and commissary restrictions and a reduction in classification status do not impose atypical and significant hardships on an inmate in relation to the ordinary incidents of prison life. *Pichardo v. Kinker,* 73 F.3d 612, 613 (5th Cir.1996); *Malchi v. Thaler,* 211 F.3d 953, 959 (5th Cir.2000).

Covarrubias also lost 180 days of good time credits. Under certain conditions, the loss of good time could inflict a

punishment imposing an atypical and significant hardship upon an inmate, because the loss of such time could result in the denial of a liberty interest in early release from prison. This condition exists where an inmate is eligible for release on mandatory supervision. *See Madison v. Parker,* 104 F.3d 765 (5th Cir.1997) (release on mandatory supervision is arguably a liberty interest in the State of Texas). However, the TDCJ records show that Covarrubias is serving a life sentence for capital murder, and therefore is not eligible for release on mandatory supervision. Tex. Gov. Code art. 508.149(a)(3) (inmates convicted of capital murder are not eligible for release on mandatory supervision); *Arnold v. Cockrell,* 306 F.3d 277, 279 (5th Cir.2002) (inmates serving life sentences are ineligible for mandatory supervision).

Thus, the loss of 180 days of good time in the disciplinary case about which Covarrubias complains would serve only to affect his possible release on parole, inasmuch as Texas law provides that the sole purpose of good time credits is to accelerate eligibility for release on parole or mandatory supervision. Tex. Gov. Code, § 498.003(a). The Fifth Circuit has expressly held that there is no constitutional right to release on parole in the State of Texas. *Creel v. Keene,* 928 F.2d 707, 708–09 (5th Cir.1991); *Allison v. Kyle,* 66 F.3d 71, 74 (5th Cir. 1995). Under these circumstances, the loss of good time credits do not affect a constitutionally protected right, but only the "mere hope" of release on parole. This hope is not protected by due process. *See Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 11, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *accord, Gilbertson v. Texas Board of Pardons and Paroles,* 993 F.2d 74, 75 (5th Cir.1993).

Furthermore, the timing of Covarrubias' release is too speculative to give rise to a constitutionally protected liberty interest.

*Malchi,* 211 F.3d at 959. Covarrubias has failed to show the deprivation of a constitutionally protected liberty interest with regard to his claims against the disciplinary hearing officer, Captain McDowell, and so these claims are without merit. *See also Sun v. U.S.,* 49 F.3d 728, 1995 WL 103351 (5th Cir., March 1, 1995) (rejecting claim of liability against disciplinary hearing officer for refusing to correct allegedly fabricated incident report, threatening plaintiff, imposing a punishment exceeding the allowable maximum, and making "numerous false statements in his reports to cover up his malicious acts").

The eighth named defendant is Covarrubias' counsel substitute, B. Childress. He asserts that Childress did not do her job properly and failed to investigate or present favorable evidence. The Fifth Circuit has held that counsel substitutes, in their function of representing inmates in disciplinary hearings, are not state actors and thus are not amenable to suit under Section 1983. *Banuelos v. McFarland,* 41 F.3d 232, 234 (5th Cir.1995). Covarrubias' claim against Childress is without merit.

Next, Covarrubias named wardens Herrera and Gordy. He complained that the wardens denied his Step One grievances, including both the appeal of the disciplinary case and his grievance about the incident itself, and conducted an inadequate investigation. Similarly, he sued C. Lawson, a central office grievance coordinator, for denying his Step Two grievances and thus depriving him of due process "by not remedying a constitutional violation well within her authority to do so."

The Fifth Circuit has held that inmates do not have a constitutionally protected liberty interest in having grievances resolved to their satisfaction, and so there is no violation of due process when prison officials fail to do so. *Geiger v. Jowers,* 404 F.3d 371, 373–74 (5th Cir.2005); *see*

*also Edmond v. Martin,* 100 F.3d 952, 1996 WL 625331 (5th Cir., Oct. 2, 1996) (prisoner's claim that a defendant "failed to investigate and denied his grievance" raises no constitutional issue); *Thomas v. Lensing, et al.,* 31 Fed.Appx. 153, 2001 WL 1747900 (5th Cir., Dec. 11, 2001) (same). The fact that Covarrubias' Step One and Step Two grievances were denied when he thought that they should have been granted does not set out a constitutional claim. Likewise, the fact that the use of force investigation and the grievance investigation did not yield the result which Covarrubias thought it should have does not amount to a constitutional violation. His claims against Herrera, Gordy, and Lawson are without merit.

Covarrubias also complained about inadequate investigations done by the use of force investigator (unknown defendant # 12), the warden's designee (unknown defendant # 15), the executive director of TDCJ (unknown defendant # 16), the regional director (unknown defendant # 17), and the ombudsman investigator (unknown defendant # 18). He states that these individuals were informed of the violations but failed to take the remedial actions which Covarrubias thought appropriate. There is no constitutional violation in the fact that these individuals apparently chose to credit the investigations conducted by TDCJ rather than believing Covarrubias' version of events, nor in the fact that because his version was not credited, the remedial action which Covarrubias thought appropriate was not taken. *Geiger,* 404 F.3d at 374. Covarrubias' claims against these defendants are without merit.

Covarrubias names an "unknown tackler," whom he says assisted Wallace and Wilson in taking him to the floor. In his complaint, he indicates that this person may have been Obrigbo. A review of the TDCJ of force records does not indicate that any other person was involved in the incident. Obrigbo will be ordered to answer the lawsuit as the possible third tackler; to the extent that Covarrubias indicates that this was someone other than Obrigbo, it is not possible to determine who this could have been, and so the claims against the unknown tackler (defendant no. 13) should be dismissed; however, should Covarrubias intend to sue someone other than Obriogbo in connection with this claim, and should he ascertain the identity of this individual within a reasonable time, as set out in the scheduling order, he may move to amend his complaint to add this person.

The final defendant named in the lawsuit is unknown defendant no. 14, whom Covarrubias identifies as "a supervisor." His only statement of claim against this person is that the unknown supervisor "failed to monitor his subordinates to ensure they follow policies to prevent harm, prior to the use of force and/or during the use of force for the proper application of force and to prevent the use of excessive force."

This is in effect a claim of liability for failure to train or supervise. The Fifth Circuit has held that for a supervisor to be liable on a theory of failure to train or supervise, the plaintiff must show an actual failure to train or supervise, a causal connection between this failure and a violation of the plaintiff's rights, and that the failure to train or supervise amounted to deliberate indifference to the plaintiff's constitutional rights. *Roberts v. City of Shreveport,* 397 F.3d 287, 292 (5th Cir. 2005); *Smith v. Brenoettsy,* 158 F.3d 908, 911–12 (5th Cir.1998). Covarrubias' bald and conclusory contention that the unknown supervisor failed to monitor his subordinates falls well short of a showing of an actual failure to train or supervise, or that such a failure amounted to deliberate

indifference to his constitutional rights. His claim on this point is without merit.

### Conclusion

28 U.S.C. § 1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees. Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

■■■ The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory. *Neitzke v. Williams,* 490 U.S. 319, 325–7, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Neitzke v. Williams,* 490 U.S. at 327, 109 S.Ct. 1827, *citing Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *see also Blackburn v. City of Marshall,* 42 F.3d 925, 931 (5th Cir.1995).

In this case, Covarrubias' claims against Officer Gladney, Sgt. Johnson, Captain McDowell, counsel substitute B. Childress, Wardens Robert Herrera and B. Gordy, central grievance coordinator C. Lawson, and the seven unknown defendants lack any arguable basis in law and fail to state a claim upon which relief may be granted. Consequently, these claims and defendants may be dismissed under 28 U.S.C. § 1915A(b). *See generally Thompson v. Patteson,* 985 F.2d 202 (5th Cir.1993). The dismissal of these claims and defendants shall have no effect on Covarrubias' claims against Officers Wallace, Wilson, and Obrigbo.

### RECOMMENDATION

It is accordingly recommended that the Plaintiff's claims against Officer Gladney, Sgt. Johnson, Captain McDowell, counsel substitute B. Childress, Wardens Robert Herrera and B. Gordy, central grievance coordinator C. Lawson, and the seven unknown defendants be dismissed with prejudice as frivolous and for failure to state a claim upon which relief may be granted. The dismissal of these claims and parties shall have no effect upon the remaining claims and defendants in the case. Finally, it is recommended that the dismissal of these claims and defendants not count as a strike for purposes of 28 U.S.C. § 1915(g), unless otherwise ordered by the Court.

A party's failure to file objections to the findings, conclusions, and recommendations contained in this Report within 14 days after service with a copy thereof shall bar that party from *de novo* review by the district judge of those findings, conclusions, and recommendations and, except upon grounds of plain error, from appellate review of the unobjected-to proposed factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc* ).

So **ORDERED** and **SIGNED** this 28 day of **September, 2012.**